UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

JERMEL BROADHURST, BETHZAIDA
ANDUJAR, and NAMEL LOVELACE,

        Defendants.
--------------------------------------------------x

**MEMORANDUM & ORDER**

16-CR-121 (FB)

*Appearances:*
*For the United States:*
ROBERT L. CAPERS
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:   TANYA HAJJAR
      Assistant United States Attorney

*For Jermel Broadhurst:*
JEREMY SCHNEIDER
Rothman, Schneider Soloway &
Stern, P.C.
100 Lafayette Street
New York, New York 10013

*For Bethzaida Andujar:*
GARY S. VILLANUEVA
11 Park Place
New York, NY 10007

*For Namel Lovelace:*
JAMES DARROW
Federal Defenders of New York
One Pierrepont Plaza
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

    Jermel Broadhurst, Bethzaida Andujar, and Namel Lovelace were indicted on

charges of conspiracy and possession of heroin with intent to distribute in violation of

21 U.S.C. §§ 841(a)(1) and 846.  They move to suppress evidence obtained by the Drug

Enforcement Administration ("DEA") in two separate automobile stops. The motions are denied.

I

The Court held an evidentiary hearing at which two DEA agents—Special Agent Matthew Ramarge and Supervisory Special Agent Orville Greene—testified. The Court now makes the following findings of facts pursuant to Federal Rule of Criminal Procedure 12(d).

## A. Initial Contact with Anonymous Informant

Between January 26 and January 30, 2016, an anonymous informant contacted the DEA and spoke to Ramarge. The informant told Ramarge that a black man and a Hispanic woman were distributing heroin, ecstasy, cocaine, and marijuana in the New York metropolitan area, upstate New York, and Connecticut.

The informant told Ramarge that the Hispanic woman was referred to as "Betsy" or "Bet" and lived at 210 Stuyvesant Avenue in Brooklyn. The informant provided Ramarge with the license plates and models of four vehicles used by Betsy and the black man: a white Honda Accord, a silver BMW, a blue Nissan Maxima, and a white Nissan Murano. The informant also told Ramarge that the man drove the Accord and BMW, and Betsy drove the Maxima and Murano.

Next, the informant stated that the black man used an apartment at 184 South 2nd

Street in Brooklyn to "bag up" heroin and as a stash house for narcotics. He specified that the apartment was the first door on the left on the fourth floor. He then told Ramarge that the man also used 184 Wyckoff Avenue in Brooklyn as a stash house for money. He also provided Ramarge with four telephone numbers the man and Betsy were using.

After receiving this information, Ramarge used law enforcement and public databases to identify Bethzaida Andujar as a resident of 210 Stuyvesant Avenue and the registered owner of the Maxima, Murano, and one of the phone numbers provided by the informant.

Ramarge provided the informant with his phone number to allow the informant to contact him directly. On the night of January 31, 2016, he received a voicemail from the informant that stated:

> I'm gonna call you tomorrow in the morning at 6:00 a.m. and see if you received this message. I just heard a little birdie told that me they're gonna have 130 grams tomorrow. Let me know if you want that bust. They gonna leave tomorrow [unintelligible], I don't exactly [sic] what time. . . . [J]ust let me know if you want the bust because I don't really know more or less what time tomorrow, but it's definitely going down tomorrow, they're going to have 130 grams and just wanted to know if you really want that.

Gov't Ex. 3500-AI-3-T-1. On February 1, 2016, the informant called Ramarge to confirm and elaborate on his voice message. He told Ramarge that later that day, the black man, who would be driving the silver BMW, would meet with his source of

supply for heroin, pick up Andujar at 210 Stuyvesant Avenue, and they would drive to 184 South 2nd Street to bag up the heroin. The informant noted that he was not sure if the man would pick up Andujar first or if he would meet with his source first, but assured Ramarge that by the time he would be headed to 184 South 2nd Street, both Andujar and the heroin would be with him.

**B. Automobile Stop on February 1, 2016**

Based on the information provided by the anonymous informant, on February 1 at 3:00 P.M., Ramarge and four other DEA agents established surveillance at 184 South 2nd Street, while Greene and Special Agent Richard Demurjian did the same at 210 Stuyvesant Avenue. Ramarge emailed the other surveilling agents a target sheet on Andujar, which contained her photograph, date of birth, address, and a summary of the information he had received from the informant.

While Ramarge sat in his parked car in the vicinity of 184 South 2nd Street, the informant called Ramarge and told him to conduct a Google search for "Heroin Highway, Queens DA case," which would bring him to a website with an article in the Times Ledger. Ramarge found the article the informant referred to, which was headlined: "Qns DA renames LIE the Heroin Highway." Gov't Ex. 1. The article featured a graphic headed "Operation Heroin Highway" above an organizational chart with pictures of eight individuals. The picture at the top of the chart was of a black

man labeled "Jermel Broadhurst a.k.a. Horns, Mel." *Id.* The informant told Ramarge that the individual at the top of the chart was the man he had been referring to. The article stated that Broadhurst had arranged for the sale of heroin to an undercover officer at a Best Western Hotel on Greenpoint Avenue.

Ramarge took a screenshot of the photo of Broadhurst with his cell phone and disseminated it to the other agents via email, noting that Broadhurst was the "[p]ossible male according to [the informant]." Gov't Ex. 3500-MR-15.

Around 6:00 P.M., Greene observed a car pull in front of 210 Stuyvesant Avenue. Demurjian stated over the agents' radio that he observed a male exit the driver's seat of the vehicle and reenter into the front passenger's seat and that Andujar then entered into the driver's seat. As the vehicle pulled back into traffic, Greene and Demurjian confirmed that it was the silver BMW bearing the license plate that the informant had provided and began to follow it. Two blocks later, the car stopped and a third person, a male, entered the BMW.

Greene and Demurjian followed the BMW to a car wash, which had a convenience store on site, located on Bushwick Avenue. The agents observed one of the males exit the vehicle. The agents then moved their car to be in a better position to be able to follow the BMW when it left the car wash. In doing so, they temporarily lost sight of it. The BMW remained for five to seven minutes before pulling back into

traffic, when Green and Demurjian reestablished surveillance of it. Greene testified that the car had not been washed.

The agents continued to follow the BMW but, eventually lost its trail. After losing surveillance, Greene and Demurjian drove to 184 South 2nd Street to join the other agents surveilling that location.

After about an hour, Greene called over the radio that he observed the BMW on Roebling Street at the intersection of South 3rd Street. Demurjian confirmed that was the BMW they had previously been following as it made a turn on to South 2nd Street. The BMW began to pull over to the left curb a few doors down from 184 South 2nd Street, and the DEA agents initiated a traffic stop.

Inside the BMW, Andujar was in the driver's seat, Broadhurst in the front passenger seat, and a third individual, Vernard Woodfin, was in the backseat. The agents instructed the individuals to exit the BMW, placed them in handcuffs, and escorted each to a separate vehicle to be interviewed.

When questioned about where she was driving, Andujar stated that they had just come from getting Chinese food and she did not know why she had turned on to South 2nd Street or began to pull the car over towards the curb when she did.

Separately, Broadhurst also stated that they had just gotten Chinese food and were on their way to a friend's house. He said Andujar was driving because he had

been drinking earlier at a birthday party.

The agents asked Broadhurst about keys that were in his possession. At first, Broadhurst stated that the keys were not his and he did not know what they were for. Broadhurst then said that the keys were his from before he went to prison, but he did not know what they went to. The agents asked if he was going to 184 South 2nd Street, which Broadhurst denied. At that time, one of the agents took the keys from Broadhurst and determined that they fit the external door of 184 South 2nd Street.

Subsequently, the officers searched the BMW for narcotics, but did not uncover any. A canine unit, trained to detect the presence of narcotics, was brought to the scene and alerted to the floor area in front of the passenger seat. After the canine alert, DEA agents continued to search the BMW, but no narcotics were found. Broadhurst, Andujar, and Woodfin were then released.

## C. Further Communications with Informant

Shortly after midnight on February 2, the confidential informant left a voice message for Ramarge that stated:

> I got some more information for you. I'm a call you. Matter of fact I'm gonna give you the information right now. They over there celebrating 'cause you didn't catch them. They moving. They getting a new stash house tomorrow. I'm over here in Cooper. They getting, they celebrating, they drinking and celebrating 'cause you didn't catch them. So, they moved everything so far tonight to the, to the Wyckoff address. 184 Wyckoff. They moving everything to a new stash house tomorrow.

Gov't Ex. 3500-AI-3-T-2. The informant then left another voice message

approximately 4 hours later stating that Broadhurst and Andujar were "braggin' about how they got away" and that "they took everything to the other address I told you about in Wyckoff." Gov't Ex. 3500-AI-3-T-3.

On February 4, Ramarge and Greene returned to 184 South 2nd Street. They confirmed that the keys seized from Broadhurst that opened the external door to 184 South 2nd Street also opened the fourth-floor apartment described by the confidential informant. They spoke with the superintendent of the building, who told them that the occupant of that apartment—whose son died of a heroin overdose—was illegally subleasing three rooms to unknown individuals. The agents also reviewed building security footage from February 1 and 2 of the door to the apartment in question; the footage did not show either Broadhurst or Andujar enter or exit from the apartment.

Over the course of the next month, the anonymous informant called Ramarge frequently to provide information about Broadhurst and Andujar, and when Ramarge did not answer his phone, the informant would leave a voice message. Ramarge asked the informant numerous times to meet face-to-face, but the informant declined and would call Ramarge from a "blocked" phone number.

During one communication, the informant told Ramarge that Broadhurst and Andujar were working out of the City View Inn Hotel. Ramarge testified that the City View Inn was previously the Best Western hotel mentioned in the Times Ledger article.

On February 20, 2016, the informant left Ramarge a long voice message that

detailed several pieces of information. He stated that the Accord that he had previously identified had new license plates and provided Ramarge with the new plate number; Ramarge confirmed that the new plate number was registered to Broadhurst. The informant then provided Ramarge with the phone numbers that Broadhurst and Andujar used to "conduct[] business." Gov't Ex. 3500-AI-3-T-5.

In the same message, the informant told Ramarge that Broadhurst "don't do no hand to hand, people buy stuff off of him." *Id.* Ramarge testified that he understood this to mean that Broadhurst was a large-scale distributor to other dealers, not to users. The informant then identified the "big carwash on Bushwick Avenue . . . next to the Popeye's" as the place where Broadhurst and Andujar met their supplier of heroin. *Id.* The informant went on to say, referring to the events of February 1, "[t]hat day when you when you um followed them, . . . that's where they went at. They met up with the connect here, they got the work, he put in his sneakers. So for now on, if you end up having to follow him remember, it's never in the vehicle, it's always on, in his sneaker, or her sneaker." *Id.* Ramarge testified that the car wash mentioned by the informant fit the description of the car wash the agents followed the BMW to on February 1. Ramarge also noted that the information about the sneakers resonated with him because it provided an explanation as to why no drugs were found on February 1 and why the dog alerted to the passenger-side floor of the BMW.

On February 25, the informant left Ramarge a voicemail that told him to have

9

"[his] guys ready for either Sunday or Monday." Gov't Ex. 3500-AI-3-T-7. He told Ramarge that Broadhurst and Andujar were going to transport narcotics upstate, leaving from Andujar's residence on either February 28 or 29. *Id.* He reminded Ramarge that they hide the narcotics in their sneakers.

On February 26, the informant left Ramarge another voice message confirming that Broadhurst and Andujar would be transporting narcotics upstate on February 29 and would be departing from Andujar's residence. On February 28, the informant left another voice message for Ramarge:

> Hey, I just want to update you. So I got the word they definitely leaving tomorrow night and they taking a little bit of everything. And the Spanish girl is always the driver. There'll be 3 or 4 people in the car, but definitely the Spanish girl is always the driver. They definitely leaving tomorrow night . . . .

Gov't Ex. 3500-AI-3-T-9. The informant later called Ramarge again to inform him that Broadhurst and Andujar would either be taking the white Accord or the blue Maxima.

### D. Automobile Stop on February 29, 2016

On February 29, 2016, at 7:30 P.M., Ramarge, Greene, and other DEA agents established surveillance at Andujar's residence at 210 Stuyvesant Avenue. In a call earlier that day, the informant told Ramarge that Broadhurst and Andujar might move their vehicles but would not be leaving from 210 Stuyvesant Avenue until they brought suitcases with them.

The agents observed as Andujar exited 210 Stuyvesant Avenue, moved the

Maxima, smoked a cigarette in the courtyard, and then re-entered the building. Subsequently, Broadhurst and another individual, later identified as Namel Lovelace, arrived in the white Accord and entered 210 Stuyvesant Avenue. When Broadhurst, Andujar, and Lovelace exited the building with suitcases, the informant called Ramarge and said they were "leaving now," to which Ramarge replied that they had not yet left. Tr. at 70. The informant then said, "well, okay, you got them, you see them," and hung up. *Id.*

The agents observed as the suspects entered the white Accord, with Andujar driving, and pulled into traffic. Ramarge and Greene testified that they followed the Accord for about fifteen minutes and initiated a traffic stop before it could pull onto the Brooklyn-Queens Expressway. The agents removed the four individuals from the car, handcuffed them, and escorted each to a different agent's car to be interviewed.

Lovelace was escorted to the vehicle of Special Agent Carlos Giraldo. Giraldo patted down and conducted a "safety search" of Lovelace. Tr. at 315. As Giraldo "got down to [Lovelace's] leg," Lovelace began kicking and screaming. *Id.* In the commotion, Giraldo grabbed one of Lovelace's shoes causing the shoe to come off and bags of heroin came "flying out" of the shoe. Tr. at 153.

Heroin was also subsequently found in Broadhurst's and Andujar's shoes, but not Woodfin's. Broadhurst, Andujar, and Lovelace were arrested, and these charges followed.

**II**

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. "A warrantless search is '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Supreme Court has specified that the "warrantless search of a car is valid if based on probable cause." *Ornelas v. United States*, 517 U.S. 690, 693 (1996) (citing *California v. Acevedo*, 500 U.S. 565, 569-70 (1991)). Because the agents in this case conducted the automobile searches without warrants, the burden is on the government to prove that they did so with probable cause. *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993) ("[T]he government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement." (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973))).

"Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Valentine*, 539 F.3d 88, 94 (2d Cir. 2008) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)). Probable cause is a "nontechnical conception[] that deal[s]

12

with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas*, 517 U.S. at 693 (internal quotation marks omitted). "While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Illinois v. Gates*, 462 U.S. 213, 235 (1983).

The totality-of-the-circumstances approach to evaluating the information available to law enforcement prior to a warrantless search also applies to evaluating the value of information provided by an anonymous informant.[1] *Id.* at 230-31. When conducting such an evaluation, courts consider "an informant's veracity, reliability, and basis of knowledge, and the extent to which an informant's statements—even about a suspect's innocent activities—are independently corroborated." *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (internal quotation marks and citations omitted).

## III

The defendants argue that the DEA agents lacked probable cause to conduct the automobile stops on February 1 and 29. However, the informant provided a great deal

---

[1] In *Illinois v. Gates*, the Supreme Court abrogated the two-pronged "*Aguilar-Spinelli* test" in favor of evaluating such information under the totality of the circumstances. The Court reasoned that the "totality-of-the-circumstances approach is far more consistent with [its] prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip." 462 U.S. at 230-31.

of information—much of which was corroborated by the agents prior to the stops—sufficient to make a commonsense, practical determination that Broadhurst and Andujar were engaged in criminal activity.

## A. The Seminal Case: *Illinois v. Gates*

In *Illinois v. Gates*, law enforcement received a letter from an anonymous informant which accused two individuals, Lance and Susan Gates, of trafficking drugs. 462 U.S. at 225. The informant's letter detailed the defendants' plan to travel from Illinois to Florida to acquire narcotics: Lance would be flying and Sue driving, and after their rendezvous in Florida and acquisition of drugs, Lance would drive the loaded car back to Illinois and Sue would fly. *Id.* The informant did not reveal his or her identity or basis of knowledge for the tip. *Id.* DEA agents confirmed that flight reservations had been made for Lance to fly from Chicago to West Palm Beach. *Id.* at 226. The DEA established surveillance of Lance's flight, and agents observed him arrive in West Palm Beach and take a taxi to a Holiday Inn and enter a room registered to a Susan Gates. *Id.* The agents observed Lance and an unidentified woman leave the hotel in a car with Illinois license plates and begin to drive northbound on an interstate "frequently used by travelers to the Chicago area." *Id.* Although the letter predicted that Sue would fly back to Illinois, she drove in the car with Lance. *Id.* at 245 n.14. When the Gateses returned to their home in Illinois, their car and home were searched by law enforcement, revealing narcotics, weapons, and other contraband. *Id.*

The Supreme Court held that probable cause supported the search because the anonymous informant provided "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 245. Even though the informant's basis of knowledge was not known, the Court explained that "probable cause does not demand the certainty we associate with formal trials." *Id.* at 246. Moreover, the anonymous letter "had been corroborated in major part" by the DEA agents, and because of the fact that the informant was mostly accurate as it related to the Gates' travel plans, it was not "unlikely that he also had access to reliable information of the Gates' alleged illegal activities." *Id.* at 245.

**B**. **Probable Cause for February 1 Stop**

In the present case, prior to the February 1 stop, the anonymous informant had communicated with Ramarge on several occasions relating to Broadhurst and Andujar's illicit activities. The informant provided details about the makes and models of four vehicles, with license plate numbers, used by Broadhurst and Andujar, and the address of Andujar's residence. Ramarge was able to confirm that both the address and two of the vehicles were associated with Andujar. The informant also provided Ramarge with a Times Ledger article that specifically identified Broadhurst and detailed allegations of Broadhurst's prior dealings in narcotics. Critically, as the informant in *Gates* did, the informant provided information on Broadhurst and Andujar's future actions. He

said that Broadhurst would pick up Andujar in a silver BMW and meet with his source of supply before driving to 184 South 2nd Street to bag up heroin. The agents corroborated this information when they observed Broadhurst pick up Andujar in a silver BMW, stop at a carwash—which Greene testified has a history of association with narcotics trafficking—for five to seven minutes without washing the car, and then drive to 184 South 2nd Street. The informant's reliability as it related to these details about Broadhurst and Andujar established his reliability as it related to their illicit activities. *See id.* Considering the totality of the circumstances in a commonsense, practical manner, Ramarge and his fellow DEA agents had probable cause to believe that Broadhurst and Andujar were engaging in criminal activity when they conducted the February 1 automobile stop.

## C. Probable Cause for February 29 Stop

Prior to the February 29 stop, the DEA agents had the benefit of frequent communications with the anonymous informant over the course of the entire month of February. The informant provided a reasonable explanation for why no narcotics were found during the February 1 stop by explaining that the narcotics were always hidden in Broadhurst's or Andujar's sneakers. Ramarge testified that this information also explained why the canine unit might have alerted to the floor of the front passenger area on February 1. The informant's information regarding the defendant's use of 184 South 2nd Street was corroborated by the fact that Broadhurst was in possession of

keys that could access that building as well as the apartment on the fourth floor the informant described. Further, the informant demonstrated his access to information that required close proximity to Broadhurst and Andujar when he described them celebrating the fact that they avoided arrest after the February 1 stop.

The informant also provided predictive details of the events of February 29, namely that Broadhurst and Andujar would be meeting at 210 Stuyvesant Avenue to transport narcotics upstate. He told Ramarge that Broadhurst and Andujar may come out of 210 Stuyvesant to move their cars, but that they would not be leaving until they brought their suitcases with them. The agents corroborated this information when they observed Andujar exit the residence, move the position of one of her cars, smoke a cigarette, and then return inside. Moreover, only after the defendants exited the building with suitcases did they depart from 210 Stuyvesant Avenue. At that time, the informant's call that the defendants were "leaving now" and statement that "you got them, you see them," indicated that the informant was personally observing the events unfold. Tr. at 79.

Again, the specificity of the informant's tips—and the agents' corroboration of many facets of them—demonstrate that the anonymous informant was sufficiently reliable; therefore, his tip that Broadhurst and Andujar were transporting narcotics provided the agents with probable cause to conduct the February 29 stop.

**D. The Defendants' Responses**

Nonetheless, Broadhurst and Andujar argue that the information provided by the anonymous informant was unreliable.

First, they argue that the tipster's anonymity, coupled with his failure to provide Ramarge with his basis of knowledge, demonstrates the informant's patent unreliability. But in *Gates*, the letter detailing the defendants' activities was anonymous and did not state the informant's basis of knowledge, yet the Supreme Court determined probable cause existed because the letter's specificity indicated that the informant "obtained his entire story either from the [defendants] or someone they trusted . . . [a]nd corroboration of major portions of the letter's predictions provides [sufficient] probability." *Gates*, 462 U.S. at 225, 246. The same is true of the information provided by the informant here. The informant's specific predictions as to Broadhurst and Andujar's behavior on both February 1 and February 29 and their corroboration—in addition to the agents' corroboration of much of the other information—alleviated the need for the informant to identify the specific basis of his knowledge.

Next, Broadhurst and Andujar insist that the informant's failure to predict that other people would accompany them in their vehicles, failure to provide a specific time for the transportation of narcotics, and the fact that no narcotics were uncovered during the February 1 stop, compel a finding that the informant was unreliable. However, the *Gates* Court explicitly rejected a requirement that an informant be "infallible." *Id.* at

245 n.14. The anonymous letter in *Gates* stated that Susan Gates would fly back from Florida, yet she accompanied Lance in the car back to Illinois. This failed prediction did not undermine the agents' corroboration of much of the other information provided in the tip, and the present informant's failure to identify others that would be in the car with Broadhurst and Andujar or provide a specific time for their departures does not do so here. Moreover, the fact that narcotics were not uncovered during the February 1 stop does not undermine the informant's reliability because the informant later provided a reasonable and specific explanation for why that occurred.

Lastly, Broadhurst and Andujar argue that the DEA agents failed to corroborate any of the informant's tip as it related to illegal activities. But the fact that the DEA agents were able to corroborate much of the information provided by the informant, including the information related to Broadhurst and Andujar's travel plans on February 1 and 29, obviated the need to corroborate the information as it related specifically to criminal activity. As the Supreme Court explained in *Gates*, "[i]f the informant had access to accurate information of [seemingly innocuous behavior] . . . it was not unlikely that he also had access to reliable information of the defendants' illegal activities." *Id.* at 245.

## IV

Lovelace argues that even if the Court were to determine that the agents had probable cause to stop and search the vehicle on February 29, the heroin found in his

shoes should be suppressed. He asserts that because the informant provided no information about him, the agents had no suspicion that he was engaged in criminal activity; therefore, when Lovelace kicked to prevent the agents from searching his shoes, he was doing so within his rights to prevent an unconstitutional search. However, at no point prior to Lovelace's shoe flying off and the heroin being discovered, were Lovelace's Fourth Amendment rights violated.

When officers lawfully stop an automobile, all occupants of the car may be ordered to exit the vehicle in order to ensure the safety of the officers. *Maryland v. Wilson*, 519 U.S. 408, 414 (1997). As the Court has determined, at the time the DEA agents stopped the vehicle they had probable cause that two of the occupants in the car were engaging in narcotics trafficking. Based on this fact, it was also reasonable for the agents to temporarily detain—even handcuff—the other occupants of the vehicle for the purposes of ensuring the agents' safety and to conduct protective frisks of *all* of the vehicle's occupants. *See United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) ("[N]ot every use of handcuffs automatically . . . requir[es] probable cause . . . . The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat."); *United States v. Ceballos*, 719 F. Supp. 119, 126 (E.D.N.Y. 1989) ("[T]he agents' reasonable suspicion that they had witnessed a narcotics transaction established the requisite premise for conducting a self-protective

frisk for weapons.").

As Giraldo's protective frisk of Lovelace neared his sneakers, Lovelace began kicking. In the commotion, Giraldo grabbed Lovelace's shoe, which resulted in the shoe flying off and the heroin being discovered. While Lovelace repeatedly characterizes this protective frisk as an unconstitutional "search," Ramarge testified that Giraldo was conducting a "safety search," which the Court understands to mean a protective frisk. Moreover, there is no evidence that Giraldo attempted to remove Lovelace's shoes prior to Lovelace kicking; the record reveals only that Lovelace began kicking as Giraldo's safety search "got down to Lovelace's leg, to his shoe area." Tr. at 315.

Accordingly, at all times prior to Lovelace's attempts to kick at agent Giraldo, the agents acted within the bounds of the Fourth Amendment. After Lovelace began kicking, the agents' attempts to ameliorate the situation were reasonable, and the discovery of the heroin within Lovelace's shoes was constitutional.

**V**

The defendants' motions to suppress are DENIED.


**SO ORDERED.**


/Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 8, 2016